IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-438-D

| | | |
|---|---|---|
| AMERICAN ENTERTAINERS, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CITY OF ROCKY MOUNT, | ) | |
| NORTH CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |

On July 31, 2014, American Entertainers, L.L.C., ("plaintiff" or "American") filed a complaint against the City of Rocky Mount, North Carolina ("defendant" or "the City") [D.E. 1]. American operates an adult club named Gentlemen's Playground ("GP") in Rocky Mount, and American's claims concern the City's ordinances regulating "Sexually Oriented Businesses." See generally Compl. [D.E. 1]. Specifically, American contends that: (1) GP does not fall within the definition of a Sexually Oriented Business as defined by the City's ordinances; (2) the City agreed to allow American to operate GP using its current format; (3) the City's licensing requirements for Sexually Oriented Businesses create an unconstitutional prior restraint on free speech; (4) the City's licensing requirements unreasonably burden free speech and infringe on the right of anonymity; (5) the City's ordinances regulating Sexually Oriented Businesses are unconstitutionally overbroad; (6) the City's prohibition of persons under the age of 21 from owning or operating a Sexually Oriented Business unconstitutionally restricts free speech; (7) the ordinance prohibiting performances for only one customer imposes an unconstitutional burden on free speech; and, (8) the prohibition against an

adult entertainer touching a patron imposes an unconstitutional burden on free speech. See Compl. ¶¶ 57–178.[1]

On November 30, 2015, the City and American filed cross-motions for summary judgment [D.E. 34, 37]. As explained below, the court grants in part and denies in part the City's motion for summary judgment and grants in part and denies in part American's motion for summary judgment.

I.

In 2002, American began operating GP as a "gentleman's club" with scantily-clad dancers. Khera Aff. [D.E. 38-1] ¶¶ 6–7. In 2003, the City threatened to bring action against American for operating a Sexually Oriented Business without a Sexually Oriented Business License in violation of the City's Sexually Oriented Business Ordinance ("SOBO"). Id. ¶ 8. On September 9, 2003, American sued the City in this court, arguing that the SOBO was unconstitutional ("the 2003 lawsuit"). Compl. ¶¶ 16–17; see also Compl., Am. Entertainers, L.L.C. v. City of Rocky Mount, No. 5:03-CV-683-BO (E.D.N.C. Sept. 9, 2003), [D.E. 1]. The City granted GP a temporary license to operate until the resolution of the 2003 lawsuit. See Chief Moore Dep. [D.E. 33-5] 21 (Deposition exhibit 42). On October 29, 2003, American's attorney Richard Wilson ("Wilson") sent an email to J. Nicholas Ellis ("Ellis"), one of City's attorneys in the 2003 lawsuit. Khera Aff. ¶ 11; Khera Aff. 9 (Affidavit exhibit A, email from Wilson to Ellis). In that email, Wilson asked Ellis to advise the City that American had changed its operating format: the dancers would use makeup latex and makeup powder to cover their areolae, where previously they had used surgical tape. Khera Aff. 9

---

[1] The complaint mislabeled two counts as "Count VII." Compl. 29, 33. American voluntarily dismissed three counts of its original complaint, including one of the counts labeled "Count VII," but did not dismiss the "Count VII," entitled "Licensing Provisions Impose an Unconstitutional Prior Restraint." [D.E. 32]. Additionally, the parties agree that Count V is moot. See Def.'s Mem. Supp. Mot. Summ. J. [D.E. 35] at 11–12; Pl.'s Resp. Opp. Def.'s Mot. Summ. J. [D.E. 43] 9.

2

Khera Aff. 9

(Affidavit exhibit A, email from Wilson to Ellis). On June 25, 2004, American voluntarily dismissed the 2003 lawsuit. [D.E. 1-4].

American asserts that it dismissed the 2003 lawsuit "pursuant to an express agreement between the parties," an agreement that was "partly in parol and partly reduced to writing." Pl.'s Mot. Summ. J. [D.E. 37] 3. As evidence of this agreement, American offers the email sent to Ellis, and the testimony of Gurnam Khera ("Khera"), who owns and operates American. See Pl.'s Mot. Summ. J. 3; Khera Aff. ¶¶ 10–12; Khera Aff. 9 (Affidavit Exhibit A, email from Wilson to Ellis). According to Khera, the 2003 lawsuit "was settled through an exchange of letters." Khera Aff. ¶¶ 10–12. No such letters, however, are in evidence. Nonetheless, according to Khera's description of the settlement,

> Plaintiff would be permitted to operate a 'bikini bar' in which performers provided live exotic dance performances while clothed in 'pasties and boy shorts.' Pasties consist of fabric or other opaque material sufficient to cover the nipples and areola. Boy shorts cover the pubic area, anal cleft, and a portion of the buttocks. The parties agreed that the quantity of clothing would be the dividing line between a sexually oriented business regulated under [the SOBO] and a bikini bar which would be unregulated by those ordinances.

Id. ¶ 10. Khera also stated that, in a conversation with Ellis and another lawyer, "it was said" that American did not require a license "if they put latex or pastie on [their areolae] . . . [t]his was the paper we had." Khera Dep. [D.E. 33-2] 65–66. The parties agree that GP continued to operate with dancers wearing as little as "pasties and boy shorts" from the lawsuit's dismissal on June 25, 2004, until July 18, 2014. Pl.'s Mot. Summ. J. 4; see Mem. Supp. Def.'s Mot. Summ. J. [D.E. 35] 4.

On April 4, 2014, a confidential informant working for the Rocky Mount Police Department entered GP and recorded video. See [D.E. 33-4] 217, 219 (Affidavit exhibit 35, Sexually Oriented Business Incident Report). The video shows performers dancing with exposed breasts, including exposed nipples, and exposed buttocks. Id. 219–20 (Affidavit exhibit 35, Sexually Oriented

3

Business Incident Report); Video at 2:30–11:10.[2] The video also shows a performer dancing for only one patron at a time in an area secluded from the view of other patrons and accepting tips. [D.E. 33-4] 220 (Affidavit exhibit 35, Sexually Oriented Business Incident Report); Video at 00:50–11:10. A man whom Corporal Jarrod Edmonds of the Rocky Mount Police Department ("Edmonds") identifies as Khera appears at the beginning and the end of the video. [D.E. 33-4] 220 (Affidavit exhibit 35, Sexually Oriented Business Incident Report); see Video at 1:30–1:40, 11:20–11:40.

On May 3, 2014, Edmonds performed a routine compliance check of GP. [D.E. 33-4] 221. During this visit, Edmonds observed performers dancing with "nipples exposed, touching patrons, conducting hand to hand tipping, . . . [and] providing a private one on one dance in a VIP area outside of eye shot from other patrons." Id. Edmonds noted that Khera was present "and did not prohibit" the dancers' behavior. Id.

On July 9, 2014, Edmonds prepared a Sexually Oriented Business report ("SOBIR") describing the results of the two police investigations. [D.E. 33-4] 217–22. Testimony from Khera as well as two of GP's dancers confirm many of the SOBIR's findings. Dancers at GP perform with their tops off and only "the areola and a little bit above the areola" covered. Khera Dep. 57–69; see also Casey Moore Dep. [D.E. 33-1] 14–15, 42–45 (stating that dancers "had to" cover "[o]nly the areola and nipple"); Brown Dep. [D.E. 33-3] 13–14, 22–27 (stating that dancers were told to cover their areolae and nipples and that dancers would not cover any other part of the breast). Dancers would perform in shorts that covered only "half of [a dancer's] buttocks . . . at all times." Casey Moore Dep. 42. According to Khera, dancers at GP also "place their hands on their breasts and

---

[2] On November 30, 2015, the City moved for leave to file a video in support of its motion for summary judgment [D.E. 36]. That same day, American responded in opposition [D.E. 39]. On May 31, 2016, the court granted the City's motion [D.E. 45]. On June 2, 2016, the City manually filed an electronic disc containing the video. See [D.E. 46].

4

squeeze them," but do so only when their breasts are "covered." Khera Dep. 93.

On July 18, 2014, American received a letter from Chief James C. Moore of the Rocky Mount Police Department ("Chief Moore"). Compl. Ex. E [D.E. 1-5]. This letter notified American that Chief Moore believed GP was operating as a Sexually Oriented Business without a license in violation of the City's SOBO and denied expressly that American had an agreement that allowed it to continue operating GP in its present format without a license. Id. The letter also stated that the Police Department would "take criminal action against" GP if it did not comply with the SOBO by August 1, 2014. Id.

On July 31, 2014, American filed this lawsuit seeking declaratory and injunctive relief [D.E. 1]. On November 30, 2015, after discovery closed, the City and American filed cross-motions for summary judgment. See [D.E. 34, 37].

II.

In considering a motion for summary judgment, the court views the evidence in the light most favorable to the non-movant and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48.

The party seeking summary judgment must initially demonstrate an absence of a genuine issue of material fact. Celotex, 477 U.S. at 325. Once the movant meets its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial.

5

See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position" suffice; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. When video evidence is in the record and "opposing parties tell two different stories, one of which is blatantly contradicted by the record [including the video], so that no reasonable jury could believe it, a court should not adopt that version." Scott, 550 U.S. at 380. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

Jurisdiction in this case rests on diversity of citizenship, and the parties agree that North Carolina law governs the underlying claims. Accordingly, the court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing Supreme Court of North Carolina opinions, the court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[3] In doing so, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[3] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

6

Moreover, in predicting how the Supreme Court of North Carolina would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 397–98.

A.

In Counts II, III, and IV, American seeks declaratory and equitable relief, arguing that it had an agreement with the City that allowed it to operate in its current format. Compl. ¶¶ 66–105 (Counts II, III, and IV). Specifically, American seeks: (1) a declaration stating that GP is exempt from the City's SOBO on the basis of the settlement agreement from the 2003 lawsuit; (2) specific performance of the settlement agreement's provisions; and, (3) for the court to estop the City from enforcing the SOBO on the basis of the agreement and the parties' conduct since the 2003 lawsuit.

At a minimum, a valid contract under North Carolina law "requires (1) assent; (2) mutuality of obligation; and (3) definite terms." Charlotte Motor Speedway, LLC v. Cty. of Cabarrus, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013); see Fordham v. Eason, 351 N.C. 151, 157–59, 521 S.E.2d 701, 705–06 (1999); McCraw v. Llewellyn, 256 N.C. 213, 216, 123 S.E.2d 575, 578 (1962); Wellington-Sears & Co. v. Dize Awning & Tent Co., 196 N.C. 748, 748, 147 S.E. 13, 15 (1929). The "mutuality" requirement "means that promises, to be enforceable, must each impose a legal liability upon the promisor." Wellington-Sears & Co., 196 N.C. at 748, 147 S.E. at 15.

"All contracts made by or on behalf of a [North Carolina] city shall be in writing." N.C. Gen. Stat. § 160A-16. An unwritten contract purported to be made by or on behalf of a city "shall be void and unenforceable unless it is expressly ratified by" the city council. Id. Equitable estoppel is an appropriate remedy when the conduct of one party has "intentionally or through culpable negligence induce[d] another to believe that certain facts exist, and such other person rightfully relies and acts upon that belief to his detriment." Carolina Water Serv., Inc. v. Town of Atl. Beach, 121 N.C. App.

7

23, 32, 464 S.E.2d 317, 323 (1995). A party may not assert equitable estoppel against a North Carolina city without showing a writing or express ratification by the city council. See id. at 32–33, 464 S.E.2d at 323 (granting summary judgment against a plaintiff who sought to assert equitable estoppel against a North Carolina municipality without showing either a writing or express ratification by the town council). "A municipality cannot be estopped to enforce a zoning ordinance against a violator by the conduct of its officials in encouraging or permitting the violation." Helms v. City of Charlotte, 255 N.C. 647, 652, 122 S.E.2d 817, 821 (1961).

American has produced no writing that constitutes an enforceable settlement agreement.[4] Khera stated that the 2003 lawsuit "was settled through an exchange of letters." Khera Aff. ¶¶ 10–11. The record, however, contains no such letters. American's only written evidence of an agreement is a single email sent over eight months before the 2003 lawsuit ended. See [D.E. 1-3] (email); Khera Aff. 9 (Affidavit Exhibit A, email from Wilson to Ellis). This email does not mention an agreement or the 2003 lawsuit which American asserts that the settlement agreement covered. Likewise, the email does not state or suggest that the City will not enforce its SOBO against GP or American. It merely states that GP's entertainers will switch from "surgical tape" to "makeup latex" to cover their areolae, that such a method is used by another establishment, and that "police have indicated" that the makeup latex "is sufficient to comply" with the SOBO. [D.E. 1-3] (email); Khera Aff. 9 (Affidavit exhibit A, email from Wilson to Ellis).

_____

[4] American argues that its settlement agreement need not be in writing. Pl.'s Resp. Opp. Def.'s Mot. Summ. J. [D.E. 43] 3 (citing Smith v. Young Moving & Storage, Inc., 167 N.C. App. 487, 493, 606 S.E.2d 173, 177 (2004) and Currituck Assocs. v. Hollowell, 166 N.C. App. 17, 28, 601 S.E.2d 256, 264 (2004)). The cases American cites involved settlement agreements between private parties, not municipalities, and neither case mentioned section 160A-16. Without a writing, this court cannot find an enforceable agreement–to settle a lawsuit or to do anything else–where one party is a North Carolina city. See N.C. Gen. Stat. § 160A-16.

8

Alternatively, even if a single email sent to a city's lawyer, to which the city never replied, could satisfy N.C. Gen. Stat. § 160A-16's writing requirement, the email to Ellis would not be sufficient to establish a contract. The email merely states that American would take certain actions and that American believed such actions complied with the SOBO. See [D.E. 1-3] (email); Khera Aff. 9 (Affidavit exhibit A, email from Wilson to Ellis). The email does not express any "mutual obligations." See Wellington-Sears, 196 N.C. at 748, 147 S.E. at 15. The email does not indicate that dancers at GP would be required to cover their areolae with makeup latex or that American gave up a right to clothe its entertainers in any other way. Rather, the email states American's belief its prior practice of using surgical tape was already "in compliance with the ordinance." See [D.E. 1-3] (email); Khera Aff. 9 (Affidavit exhibit A, email from Wilson to Ellis). Moreover, the email does not mention the 2003 lawsuit which American purports to have settled through this agreement. Although the email states that unidentified "police" believed this format did not require GP to obtain a license, it does not mention any obligation on the part of the City. See [D.E. 1-3] (email); Khera Aff. 9 (Affidavit exhibit A, email from Wilson to Ellis). The total absence of any "mutual obligation" makes this writing insufficient to demonstrate an enforceable agreement with the City. See Charlotte Motor Speedway, 230 N.C. App. at 7, 748 S.E.2d at 176. Thus, the court denies American's motion for summary judgment and grants the City's motion for summary judgment as to Counts II, III, and IV.

B.

In Count I, American seeks a declaration stating that it is not a Sexually Oriented Business under the Sexually Oriented Business Ordinance contained in Rocky Mount, N.C., Code art. VII ch. 13 (2015) (hereinafter "SOBO"). Compl. ¶¶ 55–65 (Count I). American contends that it operates a bikini bar that falls outside the SOBO. See id.

9

Numerous interrelated definitions give meaning to the SOBO. Under the SOBO, an establishment is a Sexually Oriented Business if it is an "adult cabaret." SOBO § 13-271 ("Sexually oriented business" definition). "[A]ny retail business or private club . . . which: (a) serves food or beverages, or permits the consumption of food or beverages; and (b) regularly provides or has available for viewing by its patrons or members adult live entertainment," is an adult cabaret. Id. ("Adult cabaret" definition). "Adult live entertainment" consists of live performance by human beings either performing "specified sexual activities" or displaying "specified anatomical areas." Id. ("Adult live entertainment" definition). A person displays "specified anatomical areas" if they show "(1) [l]ess than completely and opaquely covered: (i) human genitals and pubic region, (ii) buttock, or (iii) female breast below a point immediately above the top of the areola; or (2) human male genitals in a discernibly turgid state." Id. ("Specified anatomical areas" definition). A person engages in "specified sexual activities" if they, inter alia, fondle genitals, buttocks, or female breasts. Id. ("Specified sexual activities"). Therefore, taking all of these definitions together, a retail business or private club that serves food or beverages and regularly features persons engaged in specified sexual activities or showing specified anatomical areas is a Sexually Oriented Business. See id. It is unlawful to operate a Sexually Oriented Business in the City without an unexpired, unrevoked, and unsuspended Sexually Oriented Business License ("SOBL"). Id. § 13-272(a)(1).

There is no genuine issue of material fact concerning whether SOBO § 13-272(a)(1) applies to GP. GP operates as a private club and sells snacks, alcohol, and soft drinks. See Khera Dep. 44, 130. Moreover, Khera and two of GP's dancers describe the dancers' covering as limited to the areola and nipple. Id. 57–61; see also Casey Moore Dep. 42–45; Brown Dep. 22–27. Specifically, dancers would not cover any part of their breasts besides their areolae and nipples. See Casey Moore Dep. 42–45 (stating that dancers "had to" cover "only the areola and nipple"); Brown Dep. 22–27

10

(stating that dancers were told to cover their areolas and nipples, and that they would not cover any other part of the breast). Thus, the rest of the breast "below a point immediately above the top of the areola" remained exposed, constituting a display of "specified anatomical areas" under SOBO § 13-270. Furthermore, American does not have a valid SOBL and has not had one since its temporary SOBL, valid only through the termination of the 2003 lawsuit, expired with the dismissal of American's complaint on June 25, 2004. See Chief Moore Dep. 21 (deposition exhibit 42); [D.E. 1-4].[5] Finally, uncontroverted testimony and video evidence demonstrate that performers at GP regularly displayed "specified anatomical areas," making their performances "adult live entertainment" which, when regularly provided, render GP an "adult cabaret" which cannot operate without the requisite SOBL.

In opposition, American notes that the City's evidence is based on "a single police investigation conducted well over a year ago." Pl.'s Resp. Opp. Def.'s Mot. Summ. J. 2. American's argument presumably relies on SOBO § 13-271's language that adult live entertainment be "regularly provide[d] or [made] available." SOBO § 13-271(a) (emphasis added) ("Adult cabaret" definition). The testimony of Khera, Casey Moore, and Brown, however, consistently describes GP's dancers as routinely leaving exposed all of the breast except for the areola and nipple. See Khera Dep. 57–61; Casey Moore Dep. 42–45; Brown Dep. 22–27. Additionally, shorts that covered only "half of [a dancer's] buttocks" are worn "at all times." Casey Moore Dep. 42. Furthermore, although Chief Moore only engaged in one investigation, the investigation revealed

---

[5] The Temporary SOBL states that the license was "valid only until a ruling is issued by the trial court judge in" the 2003 litigation. Chief Moore Dep. 21 (deposition exhibit 42). Although the voluntary dismissal in that case was entered before the court issued any rulings, American does not argue that its Temporary SOBL remains valid almost thirteen years later. Furthermore, SOBO § 13-272(d)(1) requires that all licenses, with no exception made for temporary licenses, shall expire twelve months from the date of issuance.

the display of specified sexual activities and specified anatomical areas on two separate occasions and a confidential informant videotaped the display of specified anatomical areas on a third occasion. See [D.E. 33-4] 217–22 (Sexually Oriented Business Incident Report); see also Video. At every stage of the investigation, Khera, the manager of American, was present and did nothing to stop these displays of specified sexual activities. See [D.E. 33-4] 217–22 (Sexually Oriented Business Incident Report); Video. Thus, the court rejects American's argument.

Next, American argues that its operating format does not constitute a Sexually Oriented Business because the "settlement agreement" American had with the City allows its format. Specifically, it argues that the settlement agreement was "a binding administrative interpretation of the scope of the clothing requirements" of the SOBO. Pl.'s Resp. Opp. Def.'s Mot. Summ. J. 11. In support, American cites S.T. Wooten Corp. v. Board of Adjustment, 210 N.C. App. 633, 641, 711 S.E.2d 158, 163 (2011), where the North Carolina Court of Appeals held that a letter from a North Carolina municipality's planning director containing his final decision confirming that an owner's proposed use of his property was a "permitted use" was binding on the town. Pl.'s Resp. Opp. Def.'s Mot. Summ. J. 11.

S.T. Wooten cannot bear the weight that American places on it. In S.T. Wooten, a zoning official with statutory authority to interpret the town's zoning ordinances and advise applicants on the ordinances' application to their proposed use wrote the letter. S.T. Wooten, 210 N.C. App. at 638, 711 S.E.2d at 161. Here, in contrast, a lawyer representing American wrote an email to a lawyer representing the City to which the City never responded. Neither the email's sender nor its recipient were officials with statutory authority to interpret the SOBO. To find that mere silence or inaction after a single email to the City's lawyer establishes a binding interpretation of the SOBO directly contradicts the North Carolina Supreme Court's holding that "[a] municipality cannot be

12

estopped to enforce a zoning ordinance against a violator by the conduct of its officials in encouraging or permitting the violation." Helms, 255 N.C. at 652, 122 S.E.2d at 821. Accordingly, the court rejects American's argument.

Even viewing the evidence in the light most favorable to American, GP is a Sexually Oriented Business and lacks a SOBL. Thus, as to Count I, the court denies American's motion for summary judgment and grants the City's motion for summary judgment.

C.

In Count VII, American facially challenges the SOBO's licensing provisions as an unconstitutional prior restraint of free speech and seeks a judgment declaring the provisions unconstitutional and a permanent injunction preventing the City from enforcing the licensing provisions. Compl. ¶¶ 148–56. Specifically, American alleges that: (1) the licensing provisions requiring the chief of police to deny a license if the proposed establishment would not comply with any laws gives the chief of police unconstitutional unfettered discretion; (2) the licensing provision requiring the chief of police to deny an application if stockholders holding 10% or more of a corporate applicant's stock are convicted of certain crimes gives the chief of police unconstitutional unfettered discretion; (3) that, because the stockholder requirements would involve disclosing the identity of an applicant's stockholders, those requirements burden free speech and infringe upon the right of anonymity; and, (4) that the licensing provisions do not provide for a certain acceptance or denial of the application within a definite period of time as required by FW/PBS, Inc. v. Dallas, 493 U.S. 215 (1990).

A city ordinance that acts as a prior restraint is presumed unconstitutional, and the city must prove its constitutionality. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963); see also Cox v. City of Charleston, 416 F.3d 281, 284 (4th Cir. 2005). Content-neutral ordinances which regulate

13

the time, place, or manner of expression are valid if they are "narrowly tailored to achieve a substantial government interest[ ] and allow[ ] ample alternative channels of communication." Ross v. Early, 746 F.3d 546, 560 (4th Cir. 2014). Regulations of sexually oriented businesses are considered "content-neutral [if] they are justified without reference to the content of the impacted speech," but rather are justified by "the undesirable secondary effects" associated with sexually oriented businesses. Chesapeake B & M, Inc. v. Harford Cty, 58 F.3d 1005, 1010 (4th Cir. 1995); see also City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48–49 (1986).

Facial challenges are permitted "in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker." FW/PBS, Inc., 493 U.S. at 223. The terms upon which a license may be denied must be "narrow, objective, and definite." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969). A licensor must be limited to purely "ministerial" decisions. FW/PBS, Inc. 493 U.S. at 229. Unbridled discretion "exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion," and a valid licensing scheme requires "narrow and objective standards to limit the discretion of licensing officials." Chesapeake B & M, Inc., 58 F.3d at 1009–10. The mere "fact that an ordinance anticipates that [a city official] will gather certain information in an effort to enforce a permissible time/place/manner restriction does not, in and of itself, render the ordinance [an impermissible] prior restraint." Mom N Pops, Inc. v. City of Charlotte, 162 F.3d 1155 (4th Cir. 1998) (per curiam) (unpublished table decision) (quotation omitted).

### 1.

The SOBO states that the chief of police shall not issue an SOBL if he finds that "a sexually oriented business, . . . as proposed by the applicant, if permitted, would not comply with all applicable laws." SOBO § 13-273(d)(2). As such, the licensing requirement in SOBO § 13-

273(d)(2) grants the chief of police almost no discretion. Under the SOBO, the chief of police is to consider the "business . . . as proposed by the applicant" in light of "all applicable laws" and determine whether the business as proposed "would not comply." Id. The use of the phrase "would not comply" does not reference any standard that relies on probabilities or judgment. Only if the chief of police finds that the plan, as described by the applicant, necessarily involves noncompliance with an applicable law, may the chief of police deny the application. See id. Whether a proposed action would violate the law is a question of law. Although the question may require expertise to ascertain in some circumstances, the question is subject to a definite–not a discretionary–answer. It is true that there are many laws that might apply to any business establishment and nearly countless ways a business could fail to comply with those laws, but merely because the SOBO requires the chief of police to gather information on what laws apply and whether the proposed Sexually Oriented Business would fail to comply does not give the chief of police unfettered discretion. See, e.g., Mom N Pops, Inc. 162 F.3d at 1115.

In opposition, plaintiff cites two cases: Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301 (11th Cir. 2003), and King's Grant Inn v. Town of Gilford, No. Civ.03–249–SM, 2005 WL 361547 (D.N.H. Feb. 16, 2005) (unpublished). In both cases, zoning ordinances allowed a municipality to deny a sexually oriented business license based on an applicant's criminal history. The cases are readily distinguishable, however, because both statutes incorporated the licensor's judgment, which made their application more than simply "ministerial." See FW/PBS, Inc. 493 U.S. at 229. In Fly Fish, Inc. the ordinance allowed the city to deny a license "if the granting of the application would violate either a statute or ordinance or an order from a Court of law that effectively prohibits the applicant from obtaining an adult entertainment establishment license." Fly Fish, Inc., 337 F.3d at 1312 (quotation omitted). The court invalidated that ordinance because "whether [the laws]

15

'effectively' prohibit the applicant from obtaining a license" exceeded "the limits of permissible ministerial discretion." Id. at 1313 (quotation omitted). Similarly, in King's Grant Inn, the court held that an ordinance allowing zoning officials to deny a license if "the licensee or the proposed performers have a significant history of violating alcoholic beverage control laws or laws relating to public performances . . . exceed[ed] the limits of permissible ministerial discretion." 2005 WL 361547, at *1–2 (quotations omitted) (emphasis added).

Here, unlike in Fly Fish or King's Grant Inn, the SOBO does not grant the chief of police similar discretion. There are no requirements that the chief of police determine what violations are "significant" or whether a law would "effectively" prohibit the applicant's operation. Rather, the SOBO simply requires compliance with applicable laws. Thus, American's argument fails.

2.

American also challenges the provisions of the SOBO allowing the chief of police to deny a license where stockholders holding 10% or more of an applicant-corporation's stock have been convicted of certain crimes. See SOBO § 13-273(d)(3). American claims that this provision grants the chief of police unfettered discretion, burdens free speech, and "infringes upon the right of anonymity." Compl. ¶ 154(A)(2)(a)–(b).

"The exercise of judicial power . . . [is] restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982); see also Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 517 (4th Cir. 2003). A plaintiff bears the burden of demonstrating that it has standing to litigate a particular claim in federal court. See, e.g., Steel Co v. Citizens for a Better Env't, 523 U.S. 83, 103–04 (1998); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). The court may raise the jurisdictional

16

issue of standing sua sponte at any time. See Plyler v. Moore, 129 F.3d 728, 731 n.6 (4th Cir. 1997).

American could not suffer any "injury in fact" from the SOBO regulating corporate stockholders because those regulations do not apply to it. American is a "limited liability company," not a corporation. See Compl. ¶ 8. Thus, American lacks standing to challenge the SOBO's provisions requiring the disclosure of corporate stockholders.

3.

American also argues that the SOBO fails to satisfy the procedural requirements for prior restraints on protected expression, specifically the requirement that a decision be made within a definite period of time. Facial challenges to licensing schemes on First Amendment grounds are permitted when "the licensing scheme vests unbridled discretion in the decisionmaker." FW/PBS, Inc., 493 U.S. at 223. Unbridled discretion exists when there are insufficient "limitations on the time within which a [licensing] board decisionmaker must make a determination" as to the permitting of protected speech. Id.; see Freedman v. Maryland, 380 U.S. 51, 56–57 (1965) (stating that a failure to require a censor's decision within a definite time is "the same vice as a statute delegating excessive administrative discretion"). "A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." FW/PBS, Inc., 493 U.S. at 227. Freedman identified three procedural safeguards required for prior restraints of protected speech: (1) a restraint before judicial review must be for a definite and brief time; (2) judicial review of an ultimate decision must be available; and, (3) the authority seeking to deny permission must bear the burden of going to court and must bear the burden of proof in court. Freedman, 380 U.S. at 58–60. Of these safeguards, the first two are "essential." FW/PBS, Inc., 493 U.S. at 228.

Under the SOBO, a business that regularly provides exotic dancing such as GP may not

17

operate without a Sexually Oriented Business License ("SOBL"). See SOBO § 13-272(a)(1). The SOBO appears to require a decision on an application for an SOBL within fifteen business days. See SOBO § 13-273(e) ("The chief of police . . . shall approve or deny [a] license fifteen (15) business days from the date that [an] application was accepted."). If the chief of police denies the application within fifteen days, the SOBO permits an administrative appeal to the city manager if written notice is given within fifteen days after the denial. Id. The city manager then resolves the appeal. Id. Moreover, judicial review is available for applicants who have their applications "denied" or for "any person whose license has been revoked, suspended, or not renewed." Id. § 13-277; see id. § 13-273(e).

The SOBO also contemplates that the chief of police might not render a decision on an application within fifteen days. Id. § 13-273(e). If the chief of police fails to act on an application within fifteen days, an applicant "shall be permitted to begin operating the sexually oriented business for which the license is sought[ ] unless and until the chief of police notifies the applicant of a denial and states the reason(s) for denial." Id. The SOBO, however, provides no appeal or review for an applicant whose application has been neither approved nor denied after fifteen business days have passed. Cf. SOBO §§ 13-274, 13-276, 13-277. As such, the SOBO unconstitutionally permits the City to effectively deny a SOBL to businesses like GP by failing to act on the application. This discretion effectively gives the chief of police unreviewable power to deny an applicant the ability to open a business and engage in protected expression.[6]

_____

[6] The City has not cited, and this court has not located, a general provision of North Carolina law allowing judicial review of a municipal officer's inaction. The North Carolina Administrative Procedure Act does not apply to decisions of local municipalities. N.C. Gen. Stat. § 150A-2(1); see Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs, 299 N.C. 620, 624, 265 S.E.2d 379, 382 (1980). Nonetheless, North Carolina courts apply the North Carolina Administrative Procedure Act's principles to judicial review of municipal action. Coastal Ready-Mix Concrete Co., 299 N.C.

In opposition to this conclusion, the City argues that an applicant's ability to begin operations after fifteen business days have passed and an applicant's ability to seek judicial review if the license is eventually denied suffices under FW/PBS, Inc.. The court disagrees. The timing requirement in FW/PBS, Inc. limits an administrative official's ability to silence protected speech by simply refusing to act on a license application and thereby issue a judicially reviewable final decision on it. See FW/PBS, Inc., 493 U.S. at 227–28. Although SOBO § 13-273(e) allows an applicant to "begin operating," such operation (which generally will include incurring the expense of upfitting a location) is under a cloud of potentially imminent closure. Simply put, an applicant's temporary ability to operate a sexually oriented business pending a final decision does not satisfy FW/PBS, Inc. when the temporary ability could be revoked at any time. See Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1363 (11th Cir. 1999) ("A business can scarcely afford to operate in limbo, not knowing whether the City will shut it down the next day or not."). It is this uncertainty, which exists if the chief of police fails to render a timely decision, that allows the chief of police to effectively deny an applicant the ability to operate a business indefinitely and for no reason. See id. The temporary license does not save this portion of SOBO § 13-273(e). After all, judicial review is available only after a first-time application has been denied and does not apply when the chief of police has failed to issue any decision at all.

Having held that this portion of SOBO § 13-273(e) violates FW/PBS, Inc.'s procedural requirements, the court next addresses severability. See, e.g., Sons of Confederate Veterans, Inc. v.

---

at 624, 265 S.E.2d at 382. The North Carolina Administrative Procedure Act, however, allows review of only "the final decision" of an agency. N.C. Gen. Stat. § 150B-43; see In re N.C. Pesticide Bd. File Nos. IR94-128, IR94-151, IR94-155, 349 N.C. 656, 669, 509 S.E.2d 165, 174 (1998); Thompson v. N.C. Respiratory Care Bd., 202 N.C. App. 340, 343–44, 688 S.E.2d 516, 518 (2010). Thus, nothing suggests that a North Carolina court would review the failure to act upon an application.

Comm'r of the Va. Dep't of Motor Vehicles, 288 F.3d 610, 627 (4th Cir. 2002). State law guides severability analysis when a federal court addresses unconstitutional portions of a state law. Id.; U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 509–10 (1993) (holding that state law governs severability of a state statute). When part of a North Carolina statute has been declared unconstitutional, North Carolina courts ask whether the body enacting the statute "intended that the constitutional part of the statute be enforced after the other part has been declared unconstitutional." Fulton Corp. v. Faulkner, 345 N.C. 419, 421–22, 481 S.E.2d 8, 9 (1997). Courts should "sever a provision of an otherwise valid ordinance when the enacting body would have passed the ordinance absent the offending portion." King v. Town of Chapel Hill, 367 N.C. 400, 409–10, 758 S.E.2d 364, 372 (2014). The presence of a severability clause demonstrates legislative preference for severance. See Fulton, 345 N.C. at 422, 481 S.E.2d at 9. But even where a severability clause exists, a court may not "apply the severability clause to vary and to contradict the express terms of a statute." Sheffield v. Consol. Foods Corp., 302 N.C. 403, 422, 276 S.E.2d 422, 434 (1981).

The Rocky Mount Code contains a severability provision. Rocky Mount, N.C., Code pt. 1 subpt. B § 6 (2015) ("If any provision of this act shall be declared invalid by a court of competent jurisdiction, such invalidity shall not affect other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this act are declared to be severable." (emphasis in original)). The SOBO does as well. See SOBO § 13-286. Because the portion of SOBO § 13-273(e) that impermissibly allows city officials to indefinitely forestall granting or denying a license is limited to the language "unless and until the chief of police notifies the applicant of a denial and states the reason(s) for denial," this language alone shall be unenforceable. The remaining portions of the SOBO shall allow an applicant "to begin operating the sexually oriented business for which the license is sought" if the chief of police fails to act to approve or deny his or

her petition within fifteen days.  See SOBO § 13-243(e).[7]  Thus, the court grants in part an denies

in part the City's motion of summary judgment on Count VII and grants in part and denies in part

American's motion for summary judgment on Count VII.

D.

Finally, in Count IX, American claims that the SOBO suffers from numerous additional

constitutional defects.  Compl. ¶¶ 171–78.  Specifically, American claims that:  (1) the SOBO's

definition of "specified sexual activities" is overbroad; (2) the prohibition against adult entertainers

touching patrons is unconstitutionally overbroad; (3) the requirement that owners or operators of a

Sexually Oriented Business be 21 years old or older violates the First and Fourteenth Amendments;

(4) the requirement that adult businesses be separated by 500 feet is invalid under state law and

violates due process; and, (5) the prohibition against private performances of adult live entertainment

unconstitutionally burdens free expression.

1.

American brings a facial challenge to the SOBO's definition of "specified sexual activities,"

---

[7] This holding will not create a permanent right to operate in any format based on the chief of police's administrative failure to issue a decision.  The applicant may only operate the business "for which the license is sought."  See SOBO § 13-273(e).  Moreover, SOBLs allow operation only for twelve months, after which an applicant must apply for renewal.  See id. § 13-272(d)(1).  After one year, the chief of police will once again have the opportunity to assess the validity of the application and grant or deny an application in a timely manner.  See id.  Finally, this holding does not alter SOBO §§ 13-274, 276.  Those provisions allow the chief of police to begin revocation or suspension proceedings "where it appears that the licensee has violated any of the provisions" of the SOBO.  Id. § 13-274.  At such hearings, the city manager determines whether to "revok[e] the license, suspend[ ] the license for a period of time not to exceed ninety (90) days, or find[ ] that insufficient grounds for revocation or suspension exist and that the person should retain his or her license."  Id. § 13-276(a).  The city manager's decision is subject to judicial review.  See id. § 13-277.

claiming that it is unconstitutionally overbroad.[8] The SOBO requires establishments to obtain a SOBL if they regularly present live performers engaging in "specified sexual activities." SOBO § 13-271. Specified sexual activities include the "[f]ondling or other erotic touching of human genitals, pubic regions, buttocks or female breasts." Id. ("Specified sexual activities" definition). American argues that this provision is overbroad because the provision encompasses non-sexual conduct, including merely touching the identified body parts.

"[A] law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications . . . ." New York v. Ferber, 458 U.S. 747, 771 (1982); see Giovani Carandola, Ltd. v. Fox, 470 F.3d 1074, 1081 (4th Cir. 2006). When a challenger contends that a statute limiting expressive conduct is overbroad, the substantiality of potential impermissible applications must be "judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). To do so, a court must first apply the appropriate level of scrutiny. Giovani Carandola, Ltd., 470 F.3d at 1081. If the court may reasonably construe a statute so as not to be overbroad, it must do so. Id. at 1084; see also Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 397 (1988); Legend Night Club v. Miller, 637 F.3d 291, 300 (4th Cir. 2011).

Intermediate scrutiny is the appropriate standard by which to judge an ordinance enacted "to address the secondary effects that follow from lewd conduct on licensed premises." Giovani Carandola, Ltd., 470 F.3d at 1081 (quotation omitted). To withstand intermediate scrutiny, the city must demonstrate that its ordinance "materially advances an important or substanitial interest by

---

[8] American also argues, for the first time in its summary judgment brief, that the SOBO is unconstitutional as applied to GP. See Pl.'s Mot. Summ. J. 27–30. American's as-applied claim is not mentioned in American's complaint, and the court declines to address it. See, e.g, Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *7–10 (E.D.N.C. Sept. 28, 2011) (unpublished) (collecting cases holding that a party cannot use briefing in support of or opposition to summary judgment to amend its complaint).

redressing past harms or preventing future ones." Id. at 1082 (quotation omitted); see also Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994). The City has a substantial interest in regulating exotic dancing because such entertainment has "a long history of spawning deleterious effects." Steakhouse, Inc v. City of Raleigh, 166 F.3d 634, 637 (4th Cir. 1999). Cities also have a substantial interest in regulating "fondling . . . in licensed establishments." Carandola, 470 F.3d at 1082 (citing City of Erie v. Pap's A.M., 529 U.S. 277, 297 (2000); Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Young v. Am. Mini Theatres, Inc., 427 U.S. 50 (1976)).

In Carandola, the Fourth Circuit addressed a city ordinance that placed restrictions on, inter alia, "fondling" of erogenous zones. Carandola, 470 F.3d at 1081–84. The Fourth Circuit held that the word "fondling" was subject to a sufficiently tailored limiting construction. Id. Specifically, the Fourth Circuit held that a city ordinance prohibiting exotic dancers from "fondling" certain body parts was not unconstitutionally overbroad because it was susceptible to a limiting construction requiring that the body part in question be "manipulat[ed]" and not merely "touched." Id. Thus construed, the Fourth Circuit held that the statute survived an overbreadth challenge. Id. Applying the same analysis to SOBO § 13-271's prohibition on "fondling" by adult entertainers, this court holds that the SOBO's definition of specified sexual activities is not impermissibly overbroad. See id.

2.

American also argues that the prohibition against adult entertainers touching patrons of adult cabarets is unconstitutionally overbroad. The SOBO states that "[i]t shall be unlawful for an adult entertainer to touch a patron or the clothing of a patron at an adult cabaret" and that "[i]t shall be unlawful for a patron at an adult cabaret to touch an adult entertainer." SOBO § 13-280(e)–(f). A patron of an adult cabaret is someone who pays for entry into an establishment, who pays for goods,

services, or entertainment at the establishment, or who is a member of a private club and present on the private club's premises. Id. § 13-271 ("Patron" definition). An adult entertainer is:

> any person who requests or accepts payment, tips, or other compensation to provide entertainment by dancing, posing, or otherwise appearing within an adult cabaret with: (a) a less than fully opaque covering over any part of the genitals, pubic region, buttocks, or any part of the areola of the female breast, or (b) the covered male organ in a visibly turgid state.

Id. ("Adult entertainer" definition).

The City has a substantial interest in regulating contact between adult entertainers and patrons, due to the opportunities such interactions provide for other illegal activity and the history of harmful secondary effects of exotic dancing establishments. See, e.g., Steakhouse, Inc., 166 F.3d at 637. Nevertheless, American argues that the prohibition is unconstitutionally overbroad because it would cover completely non-sexual contact, such as a handshake or incidental contact between a fully-clothed dancer and a fully-clothed patron. See Pl.'s Mot. Summ. J. 11–12 & n.8. The City responds that the definition of an adult entertainer can be reasonably construed in a fashion that narrows the statute's scope. According to the City, a person is only an adult entertainer while exposing the body parts described in SOBO § 13-271 ("Adult entertainer" definition). Def.'s Mot. Summ. J. 35.

The City's proposed construction of the SOBO is reasonable. The SOBO, so interpreted, does not sweep "substantially" beyond the scope of its justification of limiting the opportunities for illegal activity to arise out of exotic dancing. Prohibiting incidental or non-sexual touching between patrons and performers when the performers are in the state of undress described by SOBO § 13-271's definition of an adult entertainer does not prohibit a substantial amount of conduct compared to the plainly legitimate sweep of SOBO § 13-280(e),(f). Applying the City's reasonable limiting

24

construction, the provisions of SOBO §§ 13-271 and 13-280(e),(f) are not unconstitutionally overbroad.

3.

American claims that the SOBO is unconstitutional because it prohibits persons over 18 but under 21 years of age from owning or being officers or directors of a Sexually Oriented Business. Compl. ¶ 175. Specifically, American claims that it violates the rights of such persons under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Id.

Assuming that American has someone over age 18 but under age 21 who wants to be its owner or an officer or director, "age is not a suspect classification under the Equal Protection clause." Gregory v. Ashcroft, 501 U.S. 452, 470 (1991). Therefore, the City needs "only a rational basis for its age classification." See id. Under rational-basis review, the challenged rule enjoys "a strong presumption of validity, and those attacking the rationality of the [rule] have the burden to negative every conceivable basis which might support it." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314–15 (1993) (alterations and quotations omitted); Colon Health Ctrs. of Am., LLC v. Hazel, 733 F.3d 535, 547–48 (4th Cir. 2013).

American has failed to meet its burden of proof. In fact, American has not argued that the statute is not rationally related to a legitimate government purpose beyond citing a single non-controlling case addressing the First Amendment right of 18–20 year olds to view exotic dancing. See Compl. ¶ 175; Pl.'s Mot. Summ. J. 21 n.13; Pl.'s Resp. Opp. Def.'s Mot. Summ. J. 28 n.18. American has cited no law, and this court is aware of no precedent, suggesting the Equal Protection Clause or the First Amendment encompass a right of an 18–20 year old to own or be an officer or director of a sexually oriented business. Thus, the court rejects American's argument.

25

4.

American claims that Rocky Mount Land Development Code § 503(C)(3)(a) is invalid under North Carolina law and violates due process. Section 503(C)(3)(a) requires that adult businesses be separated from each other by at least 500 feet. See Rocky Mount, N.C., Code appx. A ch.5 § 503(C)(3)(a) (2015).

The North Carolina Court of Appeals held that a North Carolina municipality may not regulate "the distance that must be kept between adult and sexually oriented businesses" because N.C. Gen. Stat. § 14-202.11 preempts such municipal regulation. See Onslow Cty. v. Moore, 129 N.C. App. 376, 386–87, 499 S.E.2d 780, 787–88 (1998). If the Supreme Court of North Carolina has not spoken on an issue, a federal district court "must follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotations omitted). Here, no "persuasive data" suggests that the Supreme Court of North Carolina would decide this issue differently than in Moore. See Toloczko, 728 F.3d at 398. Therefore, the 500-foot spacing provision in the Rocky Mount Land Development Code is void under North Carolina law. Because the 500-foot spacing provision is void under North Carolina law, the court need not address American's constitutional challenge to section 503(c)(3)(a).

5.

American claims that the SOBO's prohibition against providing adult live entertainment for only one customer is unconstitutional. The SOBO defines "adult live entertainment" as a performance by a person "which exhibits specified sexual activities or specified anatomical areas." SOBO § 13-271 ("Adult live entertainment" definition). The SOBO prohibits all adult cabarets, regardless of whether they have a license, from hosting adult live entertainment unless it is "[i]n the presence of and visually observable by more than one (1) patron." Id. § 13-280(b)(4)(b). The same

26

section also requires that a non-adult-entertainer employee be present and able to observe the adult live entertainment and that the adult live entertainment be provided on a stage without barriers. See id. § 13-280(b)(4)(a), (c)–(d).

Restrictions on the time, place, or manner of expressive conduct do not violate the First Amendment if they are narrowly tailored to serve a substantial government interest. See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294 (1984); Ross v. Early, 746 F.3d 546, 552 (4th Cir. 2014). A regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989) (quotation omitted); see also Ross, 746 F.3d at 552. The regulation of the manner of exotic dancing is a substantial government interest because such entertainment has "a long history of spawning deleterious effects." Steakhouse, Inc., 166 F.3d at 637.

One of the City's primary purposes in regulating businesses like GP is to reduce the risk of illegal activity created by "[t]he private or semi-private performance of adult live entertainment." SOBO § 13-280(a). The SOBO specifically references the harmful secondary effects of private adult live entertainment. Id. The City's goal of reducing opportunities for illegal activity would "be achieved less effectively" if the city did not ban private adult live entertainment. See, e.g., Ward, 491 U.S. at 799 (quotation omitted). Moreover, the regulation does not "burden substantially more speech than is necessary." Id. Rather, it prohibits only private dances. Therefore, because the provision is narrowly tailored to the City's substantial interest in regulating the manner of exotic dancing, it passes constitutional muster.

III.

In sum, the City's motion for summary judgment [D.E. 34] is GRANTED in part and DENIED in part, and American's motion for summary judgment [D.E. 37] is GRANTED in part and DENIED in part. The court GRANTS summary judgment to American and DENIES summary judgment to the City only as to American's challenge to the 500-foot spacing provision in section 503(C)(3)(a) of the Rocky Mount Land Development Code, which violates North Carolina law, and as to the constitutionality of the procedural timing requirements in SOBO § 13-273(e), which violates the First Amendment and is severed from the SOBO. As to American's remaining legal challenges, the court GRANTS the City's motion for summary judgment and DENIES American's motion for summary judgment. The clerk shall close the case.

SO ORDERED. This **8** day of September 2016.

JAMES C. DEVER III
Chief United States District Judge

28